**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| VINCENT FOGGEY, | |
| Plaintiff, | |
| v. | No. 16 CV 10963 |
| | Judge Manish S. Shah |
| CITY OF CHICAGO, | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

At around 3:30 a.m. one morning, plaintiff Vincent Foggey, a black man and eight-year veteran of the Chicago Police Department, walked into a Walgreens to take what was supposed to be a fifteen-minute break. More than thirty minutes later, Foggey's partner Sanjin Hodzic (a white male officer on his third day on the job) radioed to request a check in. Foggey left the Walgreens and encountered Hodzic struggling to subdue a violent aggressor. The Chicago Police Board eventually suspended and terminated Foggey for failing to adequately assist Hodzic. Foggey says he was singled out for discriminatory treatment. The City's motion for summary judgment is granted because Foggey has presented no evidence from which a reasonable juror could conclude that the City retaliated against him for complaining about discrimination or that the reasons the City gave for suspending and terminating him were pretextual justifications for race-based or sex-based discrimination.

## I.    Legal Standards

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party must show that, after "construing all facts, and drawing all reasonable inferences from those facts, in favor of the non-moving party," *United States v. P.H. Glatfelter Co.*, 768 F.3d 662, 668 (7th Cir. 2014), a reasonable jury could not return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party is entitled to summary judgment when the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[A] scintilla of evidence in support of the nonmoving party's position will be insufficient to survive a summary judgment motion; there must be evidence on which the jury could reasonably find in favor of the nonmoving party." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010). The party opposing summary judgment has the responsibility to identify the evidence that would sufficiently raise a disputed issue for trial. *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Illinois*, 908 F.3d 290, 297 (7th Cir. 2018). Perfunctory arguments, undeveloped arguments, and arguments unsupported by pertinent authority are waived. *Id.*

## II.   Facts

Vincent Foggey, a black man, [140-2] 115:18–23, became a Chicago Police Department officer in 2006. [140] ¶ 8; [148] ¶ 8.[1] During the next eight years, he

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations

received nearly thirty achievement awards and, six months before the events in question, received a performance review that noted he was "exceeding expectations." [155] ¶¶ 1, 2.

At about 3:30 a.m. one morning, Foggey requested a fifteen-minute personal break to meet with a friend inside of a Walgreens pharmacy. [140] ¶ 12; [148] ¶ 12. His partner, Sanjin Hodzic, waited outside in the squad car. *Id.* More than fifteen minutes later, Hodzic used his radio to request that Foggey check-in. [140] ¶¶ 12, 13; [148] ¶¶ 12, 13. When Foggey responded, Hodzic said he needed him in the parking lot. [140-2] 63:17–65:18; [140-5] 81:9–83:14. Foggey could hear yelling in the background and considered it a priority to find out what was going on but did not radio Hodzic back. [140] ¶ 15; [148] ¶ 15. He says he walked out of the store. [140] ¶¶ 16, 17; [148] ¶ 17. *But see* [148-5] at 3 (the friend Foggey was visiting says he "jumped up and he ran" once the radio came on).

Hodzic, a white man who had been a fully certified police officer for three days, radioed Foggey because he had just witnessed a fight break out in the parking lot. *See* [140] ¶¶ 14, 15, 17; [148] ¶ 14; [140-5] 119:15–23, 126:18–21; [140-3] at 59. As Foggey exited the Walgreens, he could see Hodzic and a man, William Brewer,

---

to depositions, which use the deposition transcript's original page number. The facts are largely taken from the parties' Local Rule 56.1 statements. [140]; [148]; [155]. When the parties raised arguments, included additional facts, or failed to cite to supporting material in the record, I disregarded those portions of their statements or responses. *See* Local Rule 56.1; *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014); *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008) ("[i]t is inappropriate to make legal arguments in a Rule 56.1 statement of facts"); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("a mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material").

engaged in a struggle on the far side of their squad car. [140] ¶¶ 14, 17, 18; [148] ¶ 14, 17, 18. Foggey saw Hodzic and Brewer engage in a conversation before Hodzic jerked Brewer towards the squad car and then tackled him to the ground. [140-2] 72:4–73:6. Throughout, Foggey continued walking toward Hodzic and Brewer at roughly the same pace. [140] ¶ 19; [148] ¶ 19.

As Foggey approached, Hodzic and Brewer were on the ground. [140] ¶ 20; [148] ¶ 20. Brewer was face down with Hodzic on top of him. [140-2] 79:11–15. Foggey leaned down, grabbed Brewer, and told him to put his hands behind his back. [140-2] 79:16–80:23. Hodzic handcuffed Brewer, Brewer was searched, and a knife was found. [140] ¶ 22; [148] ¶ 22. Foggey used his radio (for the first time since leaving Walgreens) to tell the dispatcher Brewer was in custody and secured Brewer within the police car. *Id.*; [140-2] 82:18–83:3, 294:15–22.

Hodzic did not tell Foggey what was happening outside of the Walgreens in either of the two radio transmissions that he made to Foggey that evening but his training indicated that he should have done so. [140-5] 83:16–84:1, 86:14–87:9. Hodzic also admitted that it was not "fully accurate" when he later told the person charged with investigating whether Foggey committed misconduct (then-Sergeant, now-Lieutenant Timothy Wolf, *see* [140] ¶ 32; [148] ¶ 32) that Foggey did not provide assistance until Hodzic had already placed Brewer in handcuffs because, before that, Foggey had also reached down and pulled on Brewer's shirt while Hodzic was on top of Brewer. [140-5] 274:10–276:23.

Sergeant Elise Padilla, a Hispanic woman who arrived on scene shortly after Brewer was in custody, says that Foggey told her something to the effect of, "these young kids are always getting involved in something." [140-6] 93:3–94:8; [140] ¶ 10; [148] ¶ 10. Foggey does not remember saying that. [140-2] 84:11–85:1.

The next day, as part of his duties as station supervisor, Sergeant Joaquin Mendoza (a Hispanic male) viewed a video of the events in question in order to determine whether there was probable cause to arrest Brewer for aggravated battery of a police officer. [140-7] 73:16–74:22, 152:7–21; [140] ¶ 10; [148] ¶ 10. After viewing that video, he initiated a complaint against Foggey for dereliction of duty (failing to assist his partner with an active assailant). [140-7] 44:2–12, 46:15–17. Mendoza said that Foggey had something in his hand as he exited the Walgreens (because the video depicted Foggey's elbow outstretched in front of him), but Mendoza also admitted that he was not able to see Foggey's hand at any point during the video. [140-7] 153:3–160:11. Mendoza was aware of other videos of that event (e.g., videos from security cameras inside the Walgreens) but he did not view those videos because they were not relevant to his investigation (i.e., the investigation into whether there was probable cause to believe that Brewer had committed aggravated battery). [140-7] 151:4–152:21. Instead, Mendoza believed the responsibility for obtaining and reviewing those videos would fall to whichever detective was charged with investigating his complaint against Foggey. *Id.* A different officer with the Bureau of Internal Affairs (Lieutenant Wolf) conducted the investigation into the complaint filed by Mendoza. [140] ¶ 32; [148] ¶ 32.

Foggey says that his coworkers later told him that Mendoza, Padilla, and Sergeant Charles Gray played one of the videos of the incident in front of Foggey's coworkers. [140] ¶ 36; [148] ¶ 36. Foggey saw Sgt. Mendoza sitting at the front desk of the station with a "crowd of officers … huddled around him watching" a video of the events at Walgreens. [140-2] 109:2–111:1. Foggey could hear the audio of his radio transmissions with Hodzic. [140-2] 110:5–110:19.

Mendoza did not intentionally display the video for other officers (other than his supervisor). *See* [140-7] 242:4–244:24; [140] ¶ 37; [148] ¶ [37].[2] Mendoza was watching the video at his front desk because his computer was one of the only computers capable of playing the video. [140-7] 243:6–12. Other officers may have come up to him while he was watching the videos but they were doing so in order to talk to him about other things. *Id*. 249:7–17.

Five days after the event in the Walgreens parking lot, Foggey was stripped of his police powers and reassigned while the Bureau's investigation proceeded. [140] ¶ 31; [148] ¶ 31. Foggey's hearing before the Chicago Police Board took place in November of 2015, [140] ¶ 59; [148] ¶ 59, [140-3] at 58, and Foggey filed his first claim with the Equal Employment Opportunity Commission the following month. [140]

---

[2] In response to the City's assertions that Mendoza did not intentionally display the video to other officers, *see* [140] ¶ 37, Foggey says only that he "lacks the knowledge to either admit or deny" the evidence cited in the City's statement of material facts because "he does not know why Mendoza displayed the video." [148] ¶ 37. *See also* [140-2] 115:5–17 (Foggey said during his deposition that he could not know what Mendoza was thinking and that he did not otherwise have much interaction with Mendoza). This does not controvert Mendoza's assertion of his intent, and the fact is deemed admitted.

¶ 63; [148] ¶ 63. He forwarded a copy of his EEOC claim to the Corporation Counsel's office for the City of Chicago that January. *See* [148-2] at 2.

A few months later, the Police Board wrote in its final Findings and Decision,

> Officer Foggey offered no assistance with control tactics (e.g. a wrist lock, arm bar or the use of pressure-sensitive areas on the offender, or use of control instruments or tactics), which Sergeant Larry Snelling of the Training Academy testified were required. Nor did Officer Foggey assist with the handcuffing of Mr. Brewer, which Sergeant Snelling also testified was critical in this situation.

[140-3] at 60. The board concluded that Foggey had stayed in the Walgreens until after 4:00 a.m. (roughly forty minutes after he began his break) and that his "failure to assist his partner and failure to use the training provided to him clearly put his partner in serious danger." *Id.* at 61. The board's decision mentions Foggey's alleged statement to Padilla about how "young officers get into all kinds of stuff," and found him guilty of taking actions which "impede[s] the Department's efforts to achieve its policy and goals or bring[s] discredit upon the Department," failing to perform a duty, disobedience of an order or directive, and incompetency. [140-3] at 59–63. The board voted 9-0 in favor of Foggey's discharge. [140-3] at 65.

## III.  Analysis

Foggey alleges that the City violated Title VII of the Civil Rights Act of 1964 by discriminating against him on the basis of his race and gender and in retaliation for engaging in protected activity. [27] ¶¶ 58–72, 42 U.S.C. §§ 2000e–2000e-17, § 2000e-3(a). Title VII prohibits "discriminat[ing] against any individual … because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. It also prohibits discriminating against an individual because that individual has

"opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). The City moves for summary judgment on all three claims. [138] at 2.

Foggey may prove his race-based and sex-based discrimination claims "either directly or indirectly, and with a combination of direct and circumstantial evidence." *McKinney v. Office of Sheriff of Whitley Cty.,* 866 F.3d 803, 807 (7th Cir. 2017). The inquiry is "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.,* 834 F.3d 760, 765 (7th Cir. 2016).

Foggey invokes the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). [149] at 4. *See also McKinney*, 866 F.3d at 807; *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). The *McDonnell Douglas* framework is "a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases." *David,* 846 F.3d at 224. Under that framework, Foggey carries the initial burden of establishing a prima facie case of discrimination. *McKinney*, 866 F.3d at 807; *McDonnell Douglas,* 411 U.S. at 802. He can accomplish this "by setting forth evidence that: '(1) [he] is a member of a protected class, (2) [his] job performance met [his employer's] legitimate expectations, (3) [he] suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than [Foggey].'" *McKinney,* 866 F.3d at 807. If he

does so, he is entitled to a "presumption of discrimination," and the burden shifts back to the City "'to articulate some legitimate, nondiscriminatory reason' for its employment decision." *McKinney,* 866 F.3d at 807 (quoting *McDonnell Douglas,* 411 U.S. at 802). If the City carries its burden, the burden shifts back and Foggey "must present evidence that the stated reason is a 'pretext,' which in turn permits an inference of unlawful discrimination." *Id.* (quoting *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012)).

The *McDonnell Douglas* framework is flexible. *Flores v. Preferred Tech. Grp.,* 182 F.3d 512, 515 (7th Cir. 1999). In some cases, the legitimate expectations inquiry is unhelpful as a means of organizing and assessing evidence. *David,* 846 F.3d at 224; *Flores,* 182 F.3d at 515. In some fact patterns, the inquiry should focus on whether the reasons the employer gave for the firing were pretextual. *Curry v. Menard, Inc.*, 270 F.3d 473, 476 (7th Cir. 2001). *See also Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002). Here, Foggey's performance is tied to the proffered reasons for the adverse action—the board found that he violated the rules he was expected to follow.

In order to establish that the stated reasons for his suspension and termination were pretextual, Foggey may provide a "detailed refutation" of the City's version of the events that led to his firing, so long as that refutation demonstrates that the City "may not have honestly relied on the identified deficiencies in making its decision." *Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1460–61 (7th Cir. 1994). He can do so by identifying "such weaknesses, implausibilities, inconsistencies, or contradictions" in

the City's stated reason for terminating him "that a reasonable person could find [it] unworthy of credence." *Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012). The pretext inquiry "does not address the correctness or desirability of reasons offered for employment decisions" and instead "addresses the issue of whether the employer honestly believes in the reasons it offers." *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992); *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000) ("[P]retext means a dishonest explanation, a lie rather than an oddity or an error"); *Oliver v. Joint Logistics Managers, Inc.*, 893 F.3d 408, 413 (7th Cir. 2018).

Better treatment of a similarly situated comparator is also relevant to the pretext inquiry. *Coleman*, 667 F.3d at 853. Whether comparators are similarly situated is assessed "with respect to performance, qualifications, and conduct," and that assessment "normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Peele*, 288 F.3d at 329 (emphasis in original removed). At bottom, however, the *McDonnell Douglas* framework is "not the only way to assess circumstantial evidence of discrimination," and the central question remains simply whether Foggey has "produced sufficient evidence to support a jury verdict of intentional discrimination." *David*, 846 F.3d at 224.

The parties agree that Foggey is a member of a protected class because he is black, [139] at 8, *see also Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005), and both suspension without pay pending discharge and termination are adverse employment actions. [139] at 8; *Barton v. Zimmer, Inc.*, 662 F.3d 448, 456 (7th Cir. 2011); *Whittaker v. N. Illinois Univ.*, 424 F.3d 640, 647 (7th Cir. 2005). The issue Foggey presents with regard to his race-based discrimination claim is whether the decisionmakers singled him out for discriminatory treatment while treating his partner (a white man) preferentially. *See* [149] at 5–9.

The first person Foggey focuses on is Mendoza. [149] at 5. But Mendoza was not one of the nine members of the board that voted to terminate or suspend Foggey. He did initiate the complaint that eventually led to that vote, but Foggey has not argued (nor cited any law that supports an argument) that the initiation of the complaint was the consequential action here.

Mendoza says that he declined to obtain other videos of the incident because those other videos went beyond the scope of his review (which was solely to determine whether there was probable cause to arrest Brewer for aggravated assault) and that Mendoza trusted the task of obtaining other evidence relevant to assessing Foggey's conduct to whomever was charged with investigating his complaint. Foggey offers no argument (and cites no evidence) to refute this explanation. Foggey takes issue with Mendoza's complaint which allegedly accuses Foggey of carrying something as he exited the Walgreens. Even though Mendoza did say that he could not see Foggey's hand on the video, Mendoza maintained that Foggey's elbow was outstretched in

11

front of him as though he was carrying something. [140-7] at 159:9–160:10. This discrepancy—between Mendoza claiming that he saw Foggey carrying something and Mendoza merely inferring that Foggey was carrying something—does not raise a genuine dispute over the rationale behind the board's adverse employment decisions.[3]

Attempts to draw inferences from Hodzic's preferential treatment are unpersuasive, too. Foggey and Hodzic were not similarly qualified. As the board noted in its decision, Foggey was a decorated eight-year veteran and Hodzic had been on the job for less than a week. Hodzic violated his training by failing to tell Foggey over

---

[3] Foggey's argument faces another problem: the Police Board's independent review of Foggey's conduct broke the chain of causation. After Mendoza initiated the complaint, Lt. Wolf completed the Bureau of Internal Affairs's investigation, found that Foggey had committed misconduct, and recommended separation. [140] ¶¶ 51, 52; [148] ¶¶ 51, 52. Wolf's report was then approved by multiple other members of the Bureau, [140] ¶ 53; [148] ¶ 53, before the superintendent of the Bureau filed charges. [140] ¶¶ 53, 57; [148] ¶¶ 53, 57. It was not until the superintendent filed charges that Foggey was placed on suspension (by a hearing officer who was not otherwise a part of the review of Mendoza's complaint). [140] ¶ 58; [148] ¶ 58. And this was all before the Police Board voted 9-0 in favor of discharge. [140] ¶¶ 59, 61; [148] ¶ 59, 61. Foggey does not explicitly argue that Wolf, the superintendent, the hearing officer, or the Police Board discriminated against him, *see* [149], and only says in his separate statement of facts that he "does not have sufficient knowledge to admit or deny how Wolf reached his findings." [148] ¶¶ 51–66. At the same time, he denies that "race and gender played no role" in those findings, citing only Mendoza's testimony suggesting that Hodzic may have violated the department's radio policies. [148] ¶ 52. If Foggey intended to raise a cat's paw theory of liability premised on Mendoza's animus, he has failed to raise it with sufficient specificity, and has therefore waived it. *See Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 925–26 (7th Cir. 2019). In any event, "normally, outside of the 'cat's-paw' context, [the person with the discriminatory animus] must be the decisionmaker." *Id.* This is an independent reason to grant judgment as a matter of law in favor of the City: Foggey has not presented any evidence from which a reasonable juror could conclude that the ultimate decision was informed by Mendoza's alleged bias. Even if Mendoza's initial complaint contained a fabricated allegation that Foggey was carrying a beverage as he was walking out of the Walgreens, Foggey has failed to show that the beverage allegation had anything to do with the decision to suspend and terminate Foggey. *Woods v. City of Berwyn*, 803 F.3d 865, 871 (7th Cir. 2015) ("[i]n this case, the hearing broke the chain of causation because the record shows that the Board did not rely on the facts presented by the presumably biased" employee).

the radio that there was a physical fight going on in the parking lot. The fact that two employees engaged in an "identical rule violations" provides some indication that the offenses were of "comparable seriousness," but even identical rule violations are not conclusive. *Davis v. Wisconsin Dept. of Corrections*, 445 F.3d 971, 978 (7th Cir. 2006); *Johnson v. Artim Transp. Sys., Inc.*, 826 F.2d 538 (7th Cir. 1987). And Foggey's and Hodzic's respective rule violations were not nearly as similar as were the alleged respective rule violations in *Flores v. Preferred Tech. Grp.*, 182 F.3d 512, 515 (7th Cir. 1999) and *Curry v. Menard, Inc.*, 270 F.3d 473, 476 (7th Cir. 2001). In any event, Hodzic did not communicate perfectly over the radio, but it was reasonable to be more lenient with the rookie, and the overall conduct or performance of the two officers was not similar enough to raise an inference that race explained the difference in their treatment. Hodzic did not exceed the allotted time for personal breaks, did not delay in arriving to assist his partner (he was instead the partner that needed assisting), and did not make statements to a superior suggesting that the encounter was his partner's fault.[4] These are all mitigating circumstances that justify the different treatment Hodzic received. *See Antonetti v. Abbott Labs.*, 563 F.3d 587, 592 (7th Cir. 2009) ("When 'a plaintiff claims that he was disciplined ... more harshly than a similarly situated employee,' he 'must [typically] show that ... the two employees ...

---

[4] The City characterizes Foggey's statement to Sergeant Padilla about how "young officers get into all kinds of stuff" as suggesting that Hodzic should have "look[ed] the other way." [139] at 3. Taking that statement in the light most favorable to Foggey, it could simply have meant that he believed Hodzic unnecessarily escalated the situation when he performed a take-down of Mr. Brewer. But either way, it placed the blame on Hodzic and did not accept responsibility.

engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'")

With regard to the efforts that Hodzic and Foggey took to secure Brewer, Hodzic said during his deposition that he failed to employ some of the control tactics that Foggey was criticized for failing to use and that—at least by the time Foggey finished walking over to Hodzic and Brewer—both he and Foggey were in close enough proximity to Brewer to use some of those techniques. *See, e.g.*, [140-5] at 266:19–274:9. But there were also differences in their positioning; Hodzic was straddling Brewer and Foggey was standing beside them. *See, e.g.*, [140-5] at 245:17– 247:5; 266:19–274:9; [140-2] 79:11–15.

Foggey also says that other officers at the Chicago Police Department failed to assist their partners but were treated more favorably, [140-2] at 379–383, and specifically mentions three instances in which white or non-black officers allegedly walked while moving to assist their partners and yet were not terminated. [140-2] at 379–80 (e.g., "Unknown White and Non-Black Officer Walking and Failing to Assist. Identical to the Incident involving Plaintiff, yet these officers are still employed by Defendant"). The cited pages (portions of Foggey's responses to discovery issued by the City) purport to contain log numbers and dates related to the incidents but list no names and no other details about the encounters. *Id.* The responses are signed by Foggey's attorney and not Foggey himself. [140-2] at 397. No affidavit was introduced establishing that Foggey (or anyone else) has personal knowledge of the events described in Foggey's summary of the other accusations of police misconduct. *Scott v.*

*Edinburg*, 346 F.3d 752, 759 (7th Cir. 2003) (a report "introduced into the record without any supporting affidavit verifying its authenticity" was inadmissible and could not be considered for purposes of summary judgment). *See also RBS Citizens, N.A. v. Sanyou Imp., Inc.*, 525 Fed. App'x 495, 499 (7th Cir. 2013) ("Appellants cannot avoid summary judgment by relying on mere allegations in unverified pleadings") (citing *Price v. Rochford*, 947 F.2d 829, 832 (7th Cir. 1991)). Summary judgment is the "put up or shut up" moment of the case. *Siegel*, 612 F.3d at 937. If there is admissible evidence to corroborate the statements in the unverified discovery responses Foggey cites in his summary judgment brief, Foggey was obligated to present it here. What he has presented—a list of names, log numbers, and dates, with his lawyer's unsubstantiated summaries regarding events not otherwise corroborated in the record—is not properly considered.

Foggey has some evidence that tends to refute some of the justifications the board gave for his suspension and termination. One witness says that Foggey "jumped up and ran" after receiving the radio request. [148-5] at 3. Foggey has also at least partially countered the board's conclusion that he "[a]t most … gave Mr. Brewer verbal commands … and may have placed a hand on [Brewer]" by introducing evidence that he also cleared Brewer of a dangerous weapon. [140-3] at 60; [140] ¶ 22; [148] ¶ 22; [140-2] 82:21–83:2. And by explaining that Hodzic did not tell Foggey what was going on outside in his initial radio communication, Foggey has made his decision to walk to the door of Walgreens more reasonable. *See, e.g.*, [140-5] 83:16–87:9, 90:17–91:17. But this evidence at most suggests that the board got it wrong on the merits;

it does not raise an inference that the proffered explanations were pretextual. It also does not address the board's finding that Foggey exceeded his allotted break time, failed to respond to Hodzic's radio communications sufficiently, failed to approach Hodzic with sufficient speed once he could see Hodzic and Brewer engaged in an altercation, and later blamed the events on his partner while refusing to take responsibility for his actions. *See* [140-3] at 59–64; *Khowaja v. Sessions*, 893 F.3d 1010, 1016 (7th Cir. 2018) (considering it significant to the similarly situated comparator analysis that the comparator did not defend his mistakes). Foggey's refutation of the events underlying his dismissal is incomplete and does not support a reasonable inference that the City did not honestly believe the reasons it gave for suspending and terminating him.

Foggey's failure to adduce sufficient evidence is just as plain under the broader test from *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The inquiry is "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.* The evidence Foggey has presented fails that test. At most, taking the facts in the light most favorable to Foggey, a non-black junior officer on his third day on the job engaged in a few, somewhat-similar rule violations to his eight-year senior black partner, who (in addition to those somewhat similar rule violations) took an excessive break, delayed in assisting his partner during a violent encounter, and did not accept responsibility for any errors. In such circumstances, the fact that Foggey was disciplined and Hodzic

was not does not support an inference that race was behind their difference in treatment. Foggey has also failed to allege facts showing that Mendoza's initial decision to initiate a complaint against Foggey itself amounted to (or caused) an adverse employment action or that it was racially motivated. No reasonable factfinder could conclude that Foggey's race caused his suspension or termination. The City's motion for summary judgment on the race-discrimination claim is granted.

Foggey's gender-based discrimination claim fails too. Foggey's response does not address any of the City's arguments about his gender-based discrimination claim. [149]. He cites no similarly situated comparators of a different gender, nor any of the "fishy circumstances" that might otherwise allow one to infer that any of his male supervisors discriminated against him in favor of women. *Phelan v. City of Chicago*, 347 F.3d 679, 684 (7th Cir. 2003); *Farr v. St. Francis Hosp. & Health Centers*, 570 F.3d 829, 833 (7th Cir. 2009) ("when a plaintiff is a member of a 'majority'—for instance, a male plaintiff alleging gender discrimination—we have said he must set out 'background circumstances' that show that the employer discriminates against the majority, or he must show there is something 'fishy' going on"). He provides neither evidence nor argument to rebut the City's motion for summary judgment on his gender discrimination claims, [149], and as a result, waives his arguments in support of that claim. *Gaines v. K-Five Const. Corp.*, 742 F.3d 256, 261 (7th Cir. 2014); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("[f]ailure to respond to an argument … results in waiver"); *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 898 (7th Cir. 2018). Because Foggey would have the burden to prove gender

discrimination at trial, and because Foggey has failed to submit either evidence or argument that shows a reasonable jury could rule in his favor, the City's motion for summary judgment on the gender-discrimination claim is granted. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Foggey also alleges that he was humiliated by the public display of the video of the events outside of Walgreens. *See, e.g.*, [140] ¶ 37; [148] ¶ 37. Foggey's brief contains one sentence that references the incident, [149] at 5, and there is evidence that Mendoza showed the video to others in a way that was possibly embarrassing to Foggey. *See* [140-2] 109:2–110:24. But again, Foggey does not argue that Mendoza's actions in showing the video contributed to his suspension and discharge. *See* [149] at 5. Nor does he cite any law, or make any argument, in favor of a finding that such a display created a hostile work environment or otherwise amounted to gender or racial discrimination. *See id.* Again, by failing to address that incident in his summary judgment briefing, he has waived any arguments he might have had against the City's motion for summary judgment as to those claims. *Gaines*, 742 F.3d at 261; *Bonte*, 624 F.3d at 466; *Johnson*, 892 F.3d at 898.

Foggey can only pursue a Title VII claim based on a hostile work environment theory if one was adequately described in his complaint to the Equal Opportunity Commission. *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir. 1992) ("[T]he scope of the subsequent judicial proceedings is limited by the nature of the charges filed with the EEOC"). "[A]n aggrieved employee may not complain to the EEOC of only certain instances of discrimination, and then seek judicial relief for different

instances of discrimination." *Id.* Foggey's first charge (from December 2015) with the Commission mentions only his suspension. [140] ¶ 63; [148] ¶ 63. His second charge (filed in June of 2016) mentions only his discharge. [140] ¶ 64; [148] ¶ 64. Neither charge mentions the displaying of the video or a hostile environment. The City's motion for summary judgment argues that Foggey's failure to raise a hostile work environment claim with the Commission bars his bringing that claim in this case, [139] at 14–15, and Foggey's response does not address that point. *See* [149]. As a result of the lack of further specificity or detail in his charge to the Commission, Foggey's claims about an instance of discrimination that allegedly took place when Mendoza publicly displayed the video were not preserved. *Rush*, 966 F.2d at 1110.

The claim also fails because Foggey would have needed to show that his workplace was so "permeated with discriminatory intimidation, ridicule, and insult," that was "sufficiently severe or persuasive to alter the conditions of the victim's employment." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016). "Deciding whether a work environment is hostile requires consideration of factors like the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance." *Id.* Foggey mentions only one incident in which the video was shown and does not allege that anything in the video was false. Foggey was not physically threatened, either. The workplace may have been unpleasant for Foggey in the days following the events outside of Walgreens, but he has failed to cite

to evidence in the record from which a reasonable jury could conclude that the environment was permeated with intimidation, ridicule, or insult on the basis of race.

Lastly, Foggey argues that the Police Board's decision to terminate him was retaliatory. [149] at 10. The only fact that he advances in support of this theory is that the decision to terminate him came less than three months after he sent a letter to the City (addressed to the Corporation Counsel for the City of Chicago) notifying them of the charge he made with the EEOC. [148-2]; [140] ¶ 62; [148] ¶ 62. "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 339 (2013).[5] Timing is "rarely … sufficient in and of itself to create a triable issue," and typically the gap between protected speech and adverse action cannot be more than a few days. *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012). Here, more than two months passed between the date Foggey sent his letter, [148-2], and the date that the board issued its decision. [140-3] at 65. Foggey has also failed to produce evidence suggesting that his letter was the but-for cause of the board's decision. Especially in the absence of other evidence, this two-month delay does not support an inference of retaliatory intent. The City's motion for summary judgment is granted.

---

[5] Foggey's complaint to the Equal Employment Opportunity Commission was not filed until after Mendoza allowed others to view the video, so his EEOC claim—the only protected activity Foggey identified—could not have been the cause of Mendoza's decision to display the video.

# IV.    Conclusion

The City's motion for summary judgment, [138], is granted. The order on the parties' motions to dismiss, [92], resolved the other claims in the case. The clerk shall enter judgment in favor of defendants and terminate the case.

ENTER:

_____
Manish S. Shah
United States District Judge

Date:  January 13, 2020